1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RODNEY B. BARNO,<br><br>                                    Plaintiff,<br><br>            v.<br><br>ROBERT J HERNANDEZ, Warden,<br><br>                                    Defendant. | Civil No.     08cv2439-WQH (BGS)<br><br>**REPORT AND RECOMMENDATION RE:<br>PETITION FOR WRIT OF HABEAS<br>CORPUS** |

This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2.

## I.  INTRODUCTION

Rodney Bernard Barno (herein "Barno") is a state prisoner proceeding on a Petition for a Writ of Habeas Corpus (herein "Petition") pursuant to 28 U.S.C. § 2254.  (Doc. No. 99 at 1.)  For the reasons discussed below, the Court **recommends** that the Petition be **DENIED** and that this action be **DISMISSED WITH PREJUDICE**.

## II.  FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct.  28 U.S.C. § 2254(e)(1); *see also Parke v. Baley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).  Barno may rebut the presumption of correctness, but only by clear and convincing evidence.  *Id.*

1    Barno has not rebutted the factual findings with clear and convincing evidence, therefore the

2    following facts are taken from the California Court of Appeal's opinion in *People v. Rodney Bernard*

3    *Barno*, DO45992 (Superior Court No. SCD177819).  (Lodgment 7.)  To the extent that an evaluation of

4    Barno's claims depends on further examination of the trial record, the Court has made an independent

5    evaluation of the record specific to those claims.

6        **A.    The Prosecution's Case**

7            1.  <u>Stalking, Criminal Threats and Vandalism Targeting Daniell A. (Counts 1-5)</u>

8        Barno and Daniell A. started dating at the end of January 2003.  At the time, Daniell was 19

9    years old.  They dated for approximately one to two weeks.  Daniell ended the relationship because

10   Barno was too possessive and aggressive.  Barno was incredibly upset when Daniell ended the

11   relationship.  On the evening of the break-up, Daniell's mother, Helen Anaya-Rioux, received harassing

12   phone calls from Barno.

13       Daniell went on a four-day vacation with her father and did not contact Barno when she returned.

14   While Daniell was on vacation, Barno called Helen about three times each day to ask about Daniell and

15   where she went.  When Daniell returned, her friend Josh Cardinal drove her to pick up her car that was

16   left parked at a friend's house.  When Daniell arrived at her car Barno was waiting there.  Barno wanted

17   to know why Daniell had not called him.  Daniell expressed that she wanted nothing to do with Barno.

18   Barno became upset and demanded that Daniell return the shirts from his cousin's bar where she worked

19   and told her that she no longer had a job at the bar.  He also asked about Cardinal and why she was with

20   him.  Barno demanded the shirts immediately and followed Daniell back to her house.  The two argued

21   in front of her house and Daniell's neighbor, Robert Eliasson, came outside in an attempt to intervene.

22   Eliasson told Barno to leave and Barno did so.

23       After Barno left Daniell went to her job at Islands Restaurant.  After arriving at work, Daniell

24   began receiving phone calls.  Because Daniell was not allowed to receive calls at work unless it was an

25   emergency, other employees answered the phone and told the caller that Daniell was not available to

26   talk.  Finally, the caller spoke to the manager and said that he needed to speak Daniell because there was

27   a family emergency.  Daniell was allowed to take the call in the back office.  Barno was on the phone

28   and yelled at Daniell and asked her about Cardinal.  Barno told her that if she did not give him the

1   information he wanted he would "fuck [Daniell] up and fuck up [her] car."  The call upset Daniell and
2   she became visibly anxious.

3          After work Daniell drove her Honda Civic home and parked it outside the house.  The next
4   morning she discovered her car was vandalized.  There were two large holes in the back window caused
5   by thrown rocks, a gash in the side window and damage to the door.  Daniell reported the incident to
6   police.

7          San Diego Police Officer John Jillard responded to the call.  While he was investigating the
8   incident, either Daniell or Helen received a call from Barno.  Officer Jillard took the phone and spoke to
9   Barno.  The officer asked Barno to come to the scene so he could take his statement.  Barno responded
10  that he would arrive in five minutes with his lawyer.  Officer Jillard waited for 30 minutes but Barno
11  never arrived.

12         After the vandalism incident, Daniell applied for a temporary restraining order against Barno
13  After she instituted those proceedings, Barno's threatening phone calls became more violent.  He
14  threatened to kill Daniell and continued to call her from February through April 2003.  Helen received
15  numerous calls on her cellular phone and home phone.  Helen reported the calls to police when she
16  received them.  At certain times she could identify Barno as the caller, but at other times she could not
17  identify the caller.

18         One night Helen received 65 calls on her home phone.  The caller identification on the phone
19  showed the calls coming from Barno's phone number.  The calls would come at all hours of the day and
20  night.  Sometimes the calls were hangups and other times threats were made.  The caller would say that
21  Daniell "had fucked up, and that [she] was going to get what was coming to [her]."  One threatening call
22  came from Lacee Christoffersen, who was dating Barno's younger brother Chris Barno.  In May 2003
23  Christoffersen called Daniell and stated, "They know you're behind everything that is going on, and
24  they're coming after you when all these lawsuits are over."  She also said, "You talked.  You are going
25  to get what you deserve."

26         Daniell hired an attorney, Lee Haugen, to assist her in getting a permanent restraining order
27  against Barno.  Her manager at Islands Restaurant, Patty Niemeyer, her neighbor Eliasson, and her friend
28  Frances Laverty, all provided declarations in support of the restraining order.  Barno was present at the

3

1   hearing on the restraining order.  On April 25, 2003, the court granted Daniell a three-year permanent

2   restraining order against Barno.  The order prohibited Barno from having contact with Daniell, including

3   following and harassing her.

4   After the restraining order was issued, Daniell's mother, Helen, received a threat against Daniell

5   from Barno.  That threat, along with others caused Daniell to be fearful.  Daniell was also fearful

6   because Barno had told her of incidents where he vandalized other people's cars. He told her that when

7   he lost his job with Omni Express he threw bricks through the company's windows on two separate

8   occasions.  She had also seen Barno in possession of two large guns that he kept behind his bedroom

9   door or under his bed.  She saw Barno load the gun on a couple of occasions. And while Daniell was

10  dating Barno she witnessed him vandalize a car belonging to Danielle Dotta.  Daniell drove Barno and

11  his cousin to Dotta's house where Barno and his cousin broke Dotta's car windows with a hammer and

12  crowbar.  Daniell also heard Barno call Dotta and threaten her, stating, "he knew girls that could come

13  after her and get her without her knowing who they were; that he had a lot of friends that would do that

14  for him."

15  Daniell also saw Barno drive by her house once while the restraining order was in effect.  She

16  was also harassed by Barno's brother's girlfriend on the freeway.  On another occasion Barno followed

17  her car. On another night after the restraining order was issued, Daniell received a call at home at 2:30

18  a.m. from a caller with a distorted voice.  Daniell believed Barno was the caller.  The caller threatened

19  Daniell, described what she was wearing, and said he was going to get her.  Daniell became hysterical,

20  crying and screaming in fear.

21  Because of Barno's actions Daniell changed her lifestyle.  She moved between six and eight

22  times in two years, switched jobs several times, changed her phone number, got a security dog, and did

23  not often do activities alone.

24  On April 30, 2003, a search warrant was served on Barno's home.  The police executing the

25  warrant overheard a conversation between Barno and his brother Chris.  Chris stated, "This is fucking

26  bullshit.  I know it is fucking [Daniell] who did this."  Barno responded, "Don't worry.  We will take

27  care of her real good.  She will get hers."  Later that day, Daniell received a threatening phone call from

28  Barno.  Barno told Daniell, "You'll get it, bitch."  That same day, Daniell's mother received a

4

threatening call from Barno who said, "You fucking bitch, you're dead." The call terrified her. About one week later Helen received another threatening call from Barno. Barno said, "Tell Daniell she's dead."

### 2. Criminal Threats to Matthew Ballester (Counts 6 & 7)

Matthew Ballester was Daniell's boyfriend. The two dated off-and-on for about six years. Barno's phone records showed that on February 20, 2003, he made three calls to Ballester's home phone number and one to his cell phone. On February 25, 2003, Barno made five calls to Ballester's home. Barno made threatening calls to Ballester. On one occasion Barno told him, "Watch your back. I'm coming over." Barno also spoke on the phone with Ballester's brother, Michael. Michael told Barno that Ballester was not available and Barno replied, "Tell your brother He's going to get fucked up." Barno called again soon after that call and stated, "So you think this is a joke? Well tell your brother to stay away from my girl. I'm coming over there tonight." Michael told his brother about both calls and Ballester became nervous and upset. The threats were reported to police that same night. Ballester spoke to police and told them he was "very frightened for [his] safety and the safety of his family" because of what he had heard about Barno. Accordingly, Ballester changed his lifestyle, took different routes home, and stopped parking his car in the driveway because he was afraid for his car and his family.

### 3. Criminal Threats to Suzanne and Robert Eliasson (Counts 8 & 9)

Robert Eliasson and his mother, Suzanne Eliasson lived near Daniell. Robert Eliasson provided a declaration in support of Daniell's restraining order against Barno. Between 4:30 and 7:30 p.m. on July 28, 2003, Robert received disturbing phone calls. Barno's phone records show that he made eight calls to the Eliasson home phone on that date, two calls the next day, and four calls to Suzanne's cellular phone. Robert testified that in one of the calls the caller said, "Well, how about if I wait for you and your mom some night outside your apartment or condo." Robert replied that he would defend himself. In response, the caller stated, "I'll come over and beat the shit out of you and your mother." In another call, the caller said, "I'll come over there and kill you as well." The caller told Robert he knew where he lived, recited his address, and said, "I'll come over one night, I'll wait for you and your mother, and eventually I'll kill you." Robert called the police and reported the calls. He took the calls seriously and went outside to

check his car to make sure a bomb was not planted underneath.  Robert called his mother and told her about the calls.  He gave her the caller's phone number that appeared on his phone's caller identification.  Suzanne called the number and a man who identified himself as "Bob" answered the call.  He said, "You bitch, you whore, you're dead."  This frightened Suzanne and she called the police to relay the threats.

### 4.  Criminal Threats to Jessica Grech (Count 10)

Jessica Grech dated Barno in 2002. Barno was possessive and controlling.  On one occasion Barno told Jessica he was going to make her suffer slowly.  On October 7, 2002, Jessica was out with a friend, Brett, when she received a threatening call from Barno.  Barno asked what she was doing and she told him she was "hanging out" with Brett.  Barno became angry and threatened to "fuck her up." This threatened her.  Over the next two days she received about 10 more calls from Barno.

On October 7, 2002, Jessica's father, Alfred, also received two calls from Barno.  In the first call Barno told Alfred that his daughter was involved in illegal activity.  In the second call Barno to him that he was going to "fuck up his daughter."  Alfred called Jessica and asked her to come home.  Jessica reported the calls to police.  While the police were taking a report Jessica received two more calls from Barno. Jesscia feared for her safety and believed Barno would carry out his threats.  Jessica moved to San Louis Obispo, in part to get away from Barno.  Jessica was still afraid of what he might do to her family.  On one occasion Barno stated to her, "You might not be in town, but your family is still here."

### 5.  Vandalism to Danielle Dotta's Car (Count 11)

Sometime during the night of February 2, 2003 or during the morning of February 3, 2003, Danielle Dotta's 1997 Honda Civic, which was parked in her house's driveway, was vandalized. All of the windows, with the exception of the front windshield, were completely shattered. She received a bill for $2,563 to fix her car. She paid the deductible, and her insurance company paid the balance. The day after the vandalism, Dotta received a threatening phone call from Barno. Barno was very angry and threatened to "get" Dotta if she implicated him or Daniell in the incident.  He told her he could send someone and it could happen in the parking lot of her work.  Dotta told police that she had also received a phone call from Barno two days before he vandalized Daniell's car. Barno told Dotta that he was going to take pictures of Daniell's car to show to Dotta. Later, Dotta received another call from Barno who told her he had vandalized Daniell's car, that it was worse than Dotta's, and so was the vandalism to

Daniell's "little friend's [car]." The "little friend" statement referred to Josh Cardinal. Barno also told Frances Laverty that he had vandalized Dotta's car.

### 6.  Vandalism to Josh Cardinal's Car (Count 12)

Josh Cardinal met Daniell through a mutual friend, Lacee Christoffersen, who was dating Barno's brother, Chris. In February 2003, Josh gave Daniell a ride to pick up her car that she left parked at a friend's house.  Barno pulled up behind Cardinal in a car as Josh was dropping Daniell off.  Barno, who seemed upset, asked Cardinal what he was doing and whether he was Daniell's boyfriend. Cardinal waited until Daniell got in her car and then drove away.  That evening Cardinal received a call from a person who was upset and yelled and cursed at him. The caller asked Cardinal to meet him at the park and told him, "I'm going to beat you up." Cardinal hung up the phone.

On February 20, 2003, the same night Daniell's car was vandalized, Cardinal's car was vandalized. The windows were smashed and a door was dented.  Later, Cardinal saw Barno on the street and stopped to talk to him.  Barno offered him $500 to fix the damage to his car.  Barno gave Cardinal his cell phone number, but Cardinal did not follow up.

### 7.  Vandalism to the Lavertys' Vehicles (Counts 13-16)

In 2003, Frances Laverty was friends with Daniell and also knew Barno.  She submitted a declaration in support of Daniell's application for a restraining order against Barno and appeared at the hearing. The Laverty family received a series of threatening phone calls, both before and after the hearing on the restraining order, referring to Frances Laverty's appearance at that hearing. Jennifer Laverty, Frances's sister-in-law, received one of the calls. The caller threatened to come over and damage their property, warned that Frances should "watch her back," and stated that she "was in for hard times." The caller also stated, "I will kill you, and I'll destroy your property . . . . Your sister-in-law Frances should stay out of my business."

On May 1, 2003, shortly after the court issued a restraining order against Barno, three of the Lavertys' vehicles were vandalized.  A week later, a fourth car was vandalized.  The windows were smashed on all four vehicles.  Barno's phone records showed one call to the Laverty home on April 23, 2003, one call on April 24, two calls on April 25, four calls on April 26 (the day after the restraining order was issued), and one call on May 1, 2003 (the day three of the Lavertys' vehicles were vandalized).

### 8. Harassing Phone Calls to Lee Haugen and Norma Miller (Counts 17 & 18)

Haugen was Daniell's attorney who assisted her in obtaining a restraining order against Barno. Miller was Haugen's administrative assistant. In May 2003, Haugen told Barno's attorney, Vikas Bajaj, that Barno was violating the restraining order, that he needed to get his client under control, and that Barno should not try to threaten him. Later that day, Miller received a call. The caller told her, regarding Haugen, "You tell him to watch his back, watch his fucking back every fucking minute." When Miller asked who the caller was, he stated, "None of your fucking business, fucking bitch." The call frightened Miller. Police recorded Barno's voice and played it for Miller, who recognized the voice as the caller who had made the threats to her on May 7, 2003. Phone records confirmed that Barno made a phone call to Haugen's office at 3:03 p.m. on May 7, 2003.

### 9. Prior Uncharged Acts of Domestic Violence

Jasmin Loy was 17 years old when she began dating Barno, who was 23 years old at the time. They dated on and off for a year-and-a-half, until Jasmin broke off the relationship in 2000. Barno was upset when she ended the relationship. He paged her about 50 times, drove by her house and called her at home. He threatened her and she reported the threats to police. On more than one occasion, Barno threatened to poison her horses, damage her house and kill her and her family.

On March 15, 2001, during a time Jasmin and Barno were not dating, they got into an argument. Jasmin was sitting in a car with a friend, Steve Behnke, when Barno ran up to the car yelling and screaming. Barno screamed at them, "I'm going to fuck you up and fuck her up." Barno had a lit cigarette in his hand. Barno then put the cigarette out on her face, which left a burn mark. When she and Barno were not getting along, Barno would be aggressive towards her, use bad language and threaten her. The threats made her very afraid.

**B.    Defense Case**

Barno did not testify or offer any other evidence in his defense.

### III.  RELEVANT PROCEDURAL BACKGROUND

In November 2004 a jury convicted Barno of: (1) stalking in violation of Cal. Penal Code § 646.9(a) (count one); (2) stalking after service of a restraining order in violation of Cal. Penal Code § 646.9(b) (count 2); (3) seven counts of making a criminal threat in violation of Cal. Penal Code § 422

(counts 3,4, 6-10); (4) vandalism causing damage exceeding $400 in violation of Cal. Penal Code § 594, subd. (a)(b)(1) (count 11); six counts of vandalism causing damage less than $400, a misdemeanor, in violation of Cal. Penal Code § 594, subd. (a)(b)(2)(A) (counts 5, 11-16); and (5) two counts of making harassing telephone calls, a misdemeanor, in violation of Cal. Penal Code § 653m, subd. (a).  (Lodgment 17 at Clerk's Transcript ("CT") 255-272; Lodgment 18 at Reporter's Transcript ("RT") 921-925.)  After receiving the jury verdict, Barno admitted to suffering three prior convictions in juvenile court: two for assault with a deadly weapon in violation of Cal. Penal Code § 245, subd.(a), and one for discharging a firearm in a negligent manner in violation of Cal. Penal Code § 246.  (Lodgment 17 at CT 253; Lodgment 18 at RT 928.)

As a result of the three prior strikes, the trial court sentenced Barno to state prison for a term of 50 years to life.  (Lodgment 17 at CT 208; Lodgment 18 at RT 965.)

Barno appealed the convictions to the California Court of Appeal, alleging: (1) the jury was improperly instructed on its use of prior acts of domestic violence; (2) the court abused its discretion in admitting evidence of his past acts of domestic violence; (3) the court erred by admitting a repair bill as evidence of the damage caused by his vandalism; (4) the court erred in not giving a unanimity instruction; (5) there is insufficient evidence to support the criminal threat convictions in counts 3,6, and 7; (6) the court erred in not instructing, sua sponte, on accomplice liability; (7) the court erred in not instructing the jury that a prosecution witness was an accomplice to count 11; (8) that he received ineffective assistance of counsel because counsel did not argue that the court could not use his prior juvenile adjudications as strikes; (9) the court abused its discretion in failing to strike the prior juvenile adjudications; and (10) the cumulative effect of the errors rendered the proceedings fundamentally unfair.  (Lodgment 7 at 2.)  The California Court of Appeal did find error in the court's failure to limit the instruction pertaining to prior acts of domestic violence to the felony counts also involving domestic violence, however, the error was deemed harmless.  (Lodgement 7 at 18-19.)  The court affirmed the judgment on all counts.  (Lodgement 7.)

///

///

///

9

1      Thereafter, Barno appealed to the California Supreme Court.  (Lodgment 8.)  On August 8, 2007,

2    the petition for review was denied without comment.  (Lodgment 9.)  Barno also sought review before

3    the United States Supreme Court.  (Lodgment 11.)  The Court denied the petition for a writ of certiorari.

4    (Lodgment 12.)

5      **A.**     **State Habeas Proceedings**

6      In December 2008, Barno filed a petition for writ of habeas corpus in the San Diego Superior

7    Court.  (Lodgment 20.) The petition alleged four grounds for relief: (1) newly discovered evidence

8    establishing actual innocence; (2) ineffective assistance of counsel; (3) his due process rights were

9    denied because the prosecutor knowingly offered false and perjured testimony; and (4) the cumulative

10   effect of counsel's errors violated his right to effective assistance of counsel.  (Lodgment 20.)  The San

11   Diego Superior Court issued a reasoned decision denying Barno's petition.  (Lodgment 21.)  Barno also

12   filed a petition for writ of habeas corpus with the California Court of Appeal.  (Lodgment 22.)  Barno

13   raised the same four grounds for relief as he did in superior court.  (Lodgment 22 at vii.)  On May 29,

14   2009, the California Court of Appeal issued an unpublished decision denying the petition.  (Lodgment

15   14.)  Barno exhausted these four claims for relief by filing a petition for writ of habeas corpus with the

16   California Supreme Court.  The California Supreme Court denied his petition without comment on

17   December 2, 2009.

18     **B.**     **Federal Habeas Proceedings**

19      Barno filed his original petition for writ of habeas corpus with this Court on December 31, 2008.

20   (Doc. No. 1.)  Because Barno had not exhausted all of his claims in state court, he sought a stay and

21   abeyance of his federal petition while he returned to state court to exhaust his claims.  (Mot. to Stay;

22   Doc. No. 2.)  Judge Hayes denied Barno's Motion to Stay and Abey.  (Doc. No. 41.)  On December 9,

23   2009, Barno filed a Notice of Exhaustion (Doc. No. 57) and filed a First Amended Petition on December

24   14, 2009.  (Doc. No. 60.)  On September 1, 2010, Barno requested leave to file a Second Amended

25   Petition.[1]  (Doc. No. 99.)  Ultimately Judge Hayes granted Barno's request to file a Second Amended

26   Petition.  (Doc. No. 134.)  Respondent was directed to file an Answer to the Second Amended Petition

27

28        [1]Soon after—on October 18, 2010, Barno filed a Motion for Leave to File an Addendum to the Second Amended
Petition.  (Doc. No. 105.)  Barno wanted to file an addendum in order to clarify his arguments with respect to his claim of
actual innocence.  (*Id.*)

1   and accordingly, the Answer was filed on December 16, 2011.  (Doc. No. 140.)  On January 6, 2012,

2   Barno's counsel filed a Traverse.  (Doc. No. 141.)

### IV.  PETITIONER'S CLAIMS

4       Barno's Petition presents eleven grounds for federal habeas relief.  (Pet.; Doc. No. 99-2.)  Barno

5   contends: (1) the use of juvenile adjudications to increase his sentence violated his constitutional rights

6   because a jury was not afforded in the prior proceeding; (2) the jury instruction permitting use of prior

7   uncharged acts of domestic violence to infer guilt on all charged offenses violated his due process rights;

8   (3) admitting evidence of prior uncharged acts of domestic violence violated his due process rights; (4)

9   admitting a repair bill as evidence of the amount of damage violated his rights under the confrontation

10  clause of the Sixth Amendment; (5) evidence at trial was insufficient to support the criminal threat

11  convictions in counts six and seven; (6) the trial court's failure to, sua sponte, instruct the jury on

12  accomplice liability violated his Sixth and Fourteenth Amendment rights; (7) cumulative errors rendered

13  the proceeding fundamentally unfair; (8) newly discovered evidence supporting factual innocence

14  entitles him to relief; (9) ineffective assistance of counsel for failing to investigate, call witnesses,

15  present evidence, object, and for conceding guilt; (10) that the cumulative errors trial counsel made

16  rendered counsel ineffective; and (11) the prosecution knowingly used false evidence and perjured

17  testimony in violation of his right to due process.  (*Id.*)

### V.  STANDARD OF REVIEW

19      The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which effected

20  amendments to the federal habeas statutes, applies to the present Petition because Barno filed it after

21  AEDPA's effective date—April 26, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 336, (1997). "By its terms

22  [AEDPA] bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the

23  exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, ——U.S. ——, 131 S.Ct. 770, 784, 178

24  L.Ed.2d 624 (2011).

25      A federal court may review a habeas petition by a person in custody under a state court judgment

26  "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United

27  States." 28 U.S.C. § 2254(a).   Federal habeas relief is not available for state law errors.  *Swarthout v.*

28  *Cook*, —— U.S. ——, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (per curiam) (citing *Estelle v.*

1  *McGuire*, 502 U.S. 62, 67 (1991)).

2      Under AEDPA, a federal court may not grant habeas relief on a claim adjudicated on its merits in

3  state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

      "Clearly established federal law" means federal law that is clearly defined by the holdings of the

Supreme Court at the time of the state court decision. *See,* e.g., *Cullen v. Pinholster,* —– U.S. —–, 131

S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011) (citation omitted). Although only Supreme Court law is

binding, "circuit court precedent may be persuasive in determining what law is clearly established and

whether a state court applied that law unreasonably." *Stanley v. Cullen,* 633 F.3d 852, 859 (9th Cir.2011)

(citation omitted).

      In determining whether a decision is "contrary to" clearly established federal law, a reviewing

court must evaluate whether the decision " 'applies a rule that contradicts [such] law' " and how the

decision "confronts [the] set of facts that were before the state court.' " *Cullen,* 131 S.Ct. at 1399

(quoting *Williams v. Taylor,* 529 U.S. 362, 405, 406 (2000). If the state decision " 'identifies the correct

governing legal principle' in existence at the time," a reviewing court must assess whether the decision "

'unreasonably applies that principle to the facts of the prisoner's case.' " *Id.* (quoting *Williams,* 529 U.S.

at 413).  An "unreasonable application" of law is " 'different from an incorrect application' " of that law.

*Richter,* —– U.S. —–, 131 S.Ct. at 785 (quoting *Williams,* 529 U.S. at 410). Similarly, a state-court

decision based upon a factual determination may not be overturned on habeas review unless the factual

determination is " 'objectively unreasonable in light of the evidence presented in the state-court

proceeding.' " *Stanley,* 633 F.3d at 859 (quoting *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004)).

      The AEDPA standard requires a high level of deference to state court decisions, such that a state

decision that a claim lacks merit precludes federal habeas relief so long as " 'fairminded jurists could

disagree' on the correctness of the state court's decision." *Richter,* 131 S.Ct. at 786 (quoting *Yarborough*

*v. Alvarado,* 541 U.S. 652, 664 (2004)). Accordingly, to obtain federal habeas relief a state prisoner must

1   show that the state court's decision on a federal claim was "so lacking in justification that there was an

2   error well understood and comprehended in existing law beyond any possibility for fairminded

3   disagreement." *Id*. at 786–87.  Moreover, even if this Court finds such a state-court error of clear

4   constitutional magnitude, habeas relief is not available unless the error "had substantial and injurious

5   effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting

6   *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

7        Where more than one state court has adjudicated the petitioner's claims, the federal habeas court

8   analyzes the last reasoned decision. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst*

9   *v. Nunnemaker*, 501 U.S. 797, 803 (1991), for presumption that later unexplained orders, upholding

10   judgment or rejecting same claim, rest upon same ground as the prior order). Thus, a federal habeas

11   court looks through ambiguous or unexplained state court decisions to the last reasoned decision in order

12   to determine whether that decision was contrary to or an unreasonable application of clearly established

13   federal law.  *Medley v. Runnels,* 506  F.3d 857, 862 (9th Cir. 2007); *Bailey v. Rae*, 339 F.3d 1107,

14   1112–13 (9th Cir. 2003).

15        AEDPA's strict and deferential standard of review is relaxed when the state court reaches a

16   decision on the merits but provides no reasoning to support its conclusion.  *Pirtle v. Morgan*, 313 F.3d

17   1160, 1167 (9th Cir. 2002). In these cases, "[the court] independently review[s] the record to determine

18   whether the state court clearly erred in its application of Supreme Court law." *Id*.  "That is, although [the

19   court] independently review[s] the record, [it] still defer[s] to the state court's ultimate decision.  *Id*.

20                       **VI.  ANALYSIS**

21     **1.**    **THE STATE COURT'S USE OF BARNO'S PRIOR JUVENILLE ADJUDICATIONS TO**

               **ENHANCE HIS SENTENCE UNDER CALIFORNIA'S THREE STRIKES LAW WAS NOT A**

22               **DENIAL OF DUE PROCESS**

23        In Ground One, Barno asserts that the use of his prior non-jury juvenile adjudications to enhance

24   his sentence under California's Three Strikes Law violated his due process and jury trial rights.  (Pet. at

25   6.)  Respondent contends that because the Supreme Court has not ruled that nonjury juvenile

26   adjudications cannot be used for sentence enhancement, the California court's denial of the claim is not

27   an objectively unreasonable interpretation of clearly established Supreme Court authority.  (Resp. Mem.

28   of P. & A. at 16; Doc. No. 140-1. )

1    At trial, Barno admitted he had sustained three prior juvenile adjudications; two adjudications for

2    assault with a deadly weapon and one for discharging a firearm in a negligent manner. (Lodgment 17 at

3    CT 254; Lodgment 18 at 9 RT 928.) In his state direct appeal and petition for review with the California

4    Supreme Court, Barno also challenged the use of his prior juvenile convictions to enhance his current

5    sentence. (Lodgments 1 at 62; 4 at 7; 8 at 4.) The California Court of Appeal denied the claim in a

6    reasoned decision, and the California Supreme Court denied the petition for review without comment.

7    (Lodgment 7 at 39-41; Lodgment 9.)  Barno presented the same claim to the United States Supreme

8    Court in a petition for certiorari. The Court summarily denied the petition. (Lodgments 11, 12.)

9    In its opinion denying relief, the California Court of Appeal stated :

10   California's Three Strikes law, unlike the federal sentencing law at issue in *Tighe*,
     requires that a prior conviction, including a prior juvenile adjudication, be proved beyond
11   a reasonable doubt, and provides for the right to a jury trial on the issue of whether a
     defendant has suffered a prior conviction. (citation omitted) These procedural safeguards
12   satisfy the due process concerns expressed in *Apprendi*, supra, 530 U.S. 466.

13   . . . [W]e also conclude that "a prior juvenile adjudication may constitutionally be used as
     a 'strike' despite the fact that there is no right to a jury trial in juvenile proceedings."
14   (Citation omitted).

15   (Lodgment 7 at 41.)

16   In this proceeding, Barno reiterates the same arguments he made in the state courts, citing

17   *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and *United States v. Tighe*, 266 F.3d

18   1187 (9th Cir. 2001) as support for his position that the court should not have used his juvenile

19   adjudication as a strike for sentencing purposes.

20   **A.  Applicable Legal Standard**

21   In *Boyd v. Newland*, the Ninth Circuit addressed the claim whether a state court's use of juvenile

22   adjudications to enhance a petitioner's sentence under the AEDPA standard of review, violates "clearly

23   established" federal law as pronounced by the United States Supreme Court. 467 F.3d 1139, 1152 (9th

24   Cir. 2006), citing 28 U.S.C. § 2254(d)(1)), cert. denied, 550 U.S. 933, 127 S. Ct. 2249 (2007). In

25   applying the AEDPA standard of review, the Ninth Circuit observed that the California court disagreed

26   with the holding in *Tighe*, and that the Third, Eighth, and Eleventh Circuits have held that the *Apprendi*

27   "prior conviction" exception includes nonjury juvenile adjudications that are used to enhance a

28   defendant's sentence.  *Boyd*, 467 F.3d at 1152.  The *Boyd* court further stated that *Tighe* did not

1    represent "clearly established federal law 'as determined by the Supreme Court of the United States.'"

2    *Id*.  The court in *Boyd* held, "we cannot hold that the California courts' use of Petitioner's juvenile

3    adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of,

4    Supreme Court precedent. *Id*.  The court therefore denied Boyd's request for habeas relief based on the

5    precise claim that Barno asserts here.  *Id*.

6         The California Supreme Court has also held that the use of a prior juvenile conviction as a strike

7    does not offend *Apprendi* and its progeny. *See People v. Nguyen*, 46 Cal. 4th 1007, 1021-28 (2009), cert.

8    denied, 130 S. Ct. 2091 (April 19, 2010) (noting that the "overwhelming majority of federal decisions

9    and cases from other states" have held that nonjury juvenile adjudications may be used to enhance later

10   adult sentences, and that the United States Supreme Court "has declined numerous opportunities to

11   decide otherwise").

12              **B.  Application to Barno's Petition**

13        For the reasons explained in *Boyd*, this Court finds that in the absence of Supreme Court

14   authority on this issue, it cannot be said that the California courts' denial was contrary to or an

15   unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).

16   Accordingly, no habeas relief is warranted for this claim.

17        **2**.   **THE TRIAL COURT'S INSTRUCTION REGARDING UNCHARGED ACTS OF DOMESTIC
          VIOLENCE DID NOT VIOLATE BARNO'S CONSTITUTIONAL RIGHTS**

18        Barno argues that a jury instruction—CALJIC No. 2.50.02, which permits the jurors, but does

19   not require them to consider prior acts of domestic violence—violated his constitutional right to due

20   process. (Pet. at 7.)  Respondent contends that: (1) federal habeas relief is not available for an alleged

21   error in the interpretation or application of state law; (2) that Barno has not shown how the jury

22   instruction infected his trial with unfairness sufficient to violate due process; and (3) that even if the

23   instruction was erroneous, the error did not have a "substantial and injurious effect or influence in

24   determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  (Resp. Mem. of

25   P.&A. at 19.)

26        At trial, evidence of uncharged acts of domestic violence committed by Barno was admitted

27   under Cal. Evidence Code § 1109. Specifically, in October 2002 and August 2003, Barno made threats

28   against Jessica Grech. (3 RT 380-381; 4 RT 450-452, 455.) Barno also threatened Jasmin Loy, and on

one occasion jammed a lit cigarette into her face. (5 RT 619, 634.)  These two uncharged incidents were admitted as evidence at trial.

The jury was instructed pursuant to CALJIC No. 2.50.02 as follows:

Evidence has been introduced for the purpose of showing the defendant engaged in a offense involving domestic violence [on one or more occasions] other than that charged in the case.

"Domestic violence" means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant has had a child or is having or has had a dating or engagement relationship.

"Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension or imminent serious bodily injury to himself or herself, or another.

If you find that the defendant committed a prior offense involving domestic violence you may, but are not required to, infer that the defendant had a disposition to commit other offenses involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused. However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses. If you determine an inference properly drawn from this evidence, this inference is simply on item for you to consider, along with all the other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.

Unless you are otherwise instructed, you must not consider this evidence for any other purpose. (CT 132; 5 RT 623-24; 6 RT 801-02.)

In his direct appeal, Barno argued that the trial court erred in instructing the jury under CALJIC No. 2.50.02. (Lodgment 8.) The California Court of Appeal rejected Barno's challenge to CALJIC No. 2.50.02.  In doing so, however, the court did find a problem with the instruction because there were other charged crimes that did *not* involve domestic violence and the instruction was not limited by the court to the counts involving domestic violence.  (Lodgment 7 at 18.)  Nonetheless, the court determined that:

[A]ny error by the court in using CALJIC No. 2.50.02 without limiting its application to counts 3, 4 and 10 does not require a reversal. First, defense counsel admitted that Barno committed the acts that formed the basis for the other felony charges, but argued that they only amounted to at most misdemeanor conduct. CALJIC No. 2.50.02 did not tell the jury, and the prosecutor in closing argument in no way argued, that the prior domestic violence evidence tended to prove Barno was guilty of felony, as opposed to misdemeanor conduct. Additionally, the prosecutor's argument concerning the prior domestic violence incident involving Jasmin L. consisted of less than two pages of a closing argument that totaled 30 pages. Finally, the evidence overwhelmingly supported the jury's verdict on all charged offenses. Thus, it was not reasonably likely that, but for the court's error in instructing the jury under CALJIC No. 2.50.02, Barno would have

08cv2439-WQH

received a more favorable result at trial. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) (Lodgment 7 at 19.)

### A.  Applicable Legal Standard

First, rulings based on an alleged error in the interpretation or application of state law cannot serve as a basis for habeas relief unless the asserted error rises to the level of a federal constitutional violation. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir.1991) ("the presence or absence of a state law violation is largely beside the point"). It is "well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process." *Spivey v. Rocha*, 194 F.3d 971, 977–78 (9th Cir.1999); *see also Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir.2008) (for purposes of federal habeas review, it is "irrelevant" whether or not an evidentiary ruling is correct under state law; the only question is whether the ruling rendered the trial so fundamentally unfair as to violate due process); *Drayden v. White*, 232 F.3d 704, 710 (9th Cir.2000) ("The improper admission of evidence does not violate the Due Process Clause unless it is clearly prejudicial and 'rendered the trial fundamentally unfair.' ") (citation omitted).

In this case, Barno also contends that the instructional error violated federal due process standards.  The California Court of Appeal, however, only provided reasoning based on state law in its decision concluding that the instructional error did not warrant reversal.  (Lodgment 7 at 19.)  Because no state court provided reasoning in support of its decision to deny Barno's federal due process claim for instructional error, the Court independently reviews the record to determine whether the state court clearly erred in its application of Supreme Court law in reaching its decision on the merits of the federal claim.  *Pirtle*, 313 F.3d at 1167 (explaining that when a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court on habeas review must relax AEDPA's strict standard of review and independently review the record to determine whether the state court clearly erred in its application of Supreme Court law).  That is, although the Court independently reviews the record, it still defers to the state court's ultimate decision.[2]

---

[2] This case does not present a situation where the Court performs a de novo review because unlike a situation where the state court did not reach the merits of the claim—i.e. because of a procedural bar—there *is* a state court decision on this issue to which to accord deference.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the disputed instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72 (1991). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.* In other words, a federal habeas court must evaluate the jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982).

**B. Application to Barno's Petition**

Barno has not shown that the instruction infected the trial to the extent that he was denied a fair trial under due process standards.  First, the instruction permitted, but does not require, the jury to consider evidence that Barno committed other offenses. Because the instruction was permissive, the jury was not even required to consider such evidence, must less required to make a finding of guilt based upon it. Rather, the jury was free to accept or reject such evidence, and even if it accepted such evidence as true, to give it any weight it chose.

Second, nothing in the instruction lowered the prosecution's burden of proof. The instructions themselves explicitly state that the prior act evidence "is not sufficient by itself to prove that [petitioner] is guilty of the charged offense." The jury was also separately instructed that it had to be convinced of Barno's guilt beyond a reasonable doubt. The Court must presume that the jurors followed the instructions and applied the proper legal standard. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

The California Court of Appeal's decision that CALJIC No. 2.50.02 did not affect the prosecution's burden to prove Barno's guilt beyond a reasonable doubt on counts not involving domestic violence was not an incorrect application of Supreme Court law.  After an independent review of the record and for the reasons stated above, the Court finds that the error did not have a substantial and injurious effect on the jury's verdict. *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Accordingly, Barno's claim is denied.

///

///

///

08cv2439-WQH

**3.** **THE ADMISSION OF PRIOR CRIMINAL PROPENSITY EVIDENCE DID NOT VIOLATE THE DUE PROCESS CLAUSE**

In this ground Barno alleges his rights to due process and a fair trial were violated by the trial court's admission of evidence that he threatened to kill a former girlfriend, Jasmin Loy, and shoved a lit cigarette into her face. (Pet. at 8.)  Respondent argues that the admission of prior criminal acts as propensity evidence was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. (Resp. Mem. of P.&A. at 23.) In his Traverse, Barno concedes that habeas relief is not available for this claim.[3]  (Pet. Mem. of P.&A. ISO Traverse at 25; Doc. No. 141.)

The prior acts in this case were admitted pursuant to California Evidence Code section 1109, the sections that permits the admission of prior domestic violence evidence. (Lodgment 18 at 1 RT 118-19, 122, 126.)  The trial court found evidence that Barno had threatened to kill Jasmin and her family and to poison her horses and damage her property, along with burning her face with a lit cigarette, was relevant and probative to the criminal threat charges involving Daniell and Jessica G. (Lodgment 18 at 1 RT 122-123, 125.)  The California Court of Appeal rejected Barno's contention that his due process rights were violated by the trial court's admission of evidence of these prior acts.  (Lodgment 7 at 21.)

**A.  Applicable Legal Standard**

The Supreme Court has not held that a state law that permits the use of prior crimes as propensity evidence violates the Due Process Clause. *Estelle*, 502 U.S. at 75 n. 5 (1991) ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crime' evidence to show propensity to commit a charged crime."); *see also Mejia v. Garcia*, 534 F.3d 1036, 1046-47 (9th Cir. 2008) (rejecting petitioner's contention that the California Court of Appeal's decision concerning propensity evidence was an unreasonable application of clearly established Supreme Court law); *Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006).

///

///

---

[3]Barno acknowledges that the Ninth Circuit expressly dealt with this same issue in *Mejia* and *Alberni* and held that there is no Supreme Court law that precludes a state from admitting criminal propensity evidence.  Resp. Mem. P.&A. at 25.

08cv2439-WQH

## B.  Application to Barno's Petition

Because the Supreme Court has expressly left open the question of whether a state law permitting the introduction of propensity evidence would violate due process, the state court's decision rejecting Barno's due process challenge to the propensity evidence admitted pursuant to Section 1109 cannot have been contrary to, or an unreasonable application of, clearly established law. *See Alberni*, 458 F.3d at 866. Therefore, this claim does not warrant habeas relief.

### 4.   THE ADMISSION OF A CAR REPAIR BILL AS A BUSINESS RECORD DID NOT VIOLATE BARNO'S CONSTITUTIONAL RIGHTS

In his Petition, Barno alleges that the trial court's admission of a repair bill to prove that the amount of damages to Danielle Dotta's car exceeded $400 violated his right to a fair trial.  First, he argues the repair bill was inadmissible hearsay, and second, that it violated his constitutional right to confront witnesses because he was not able to cross-examine the person who prepared the repair bill. (Pet. at 9, 29.)  Respondent contends that the claim fails to establish an erroneous application of state law evidentiary rules, and that it also fails to establish that the trial court's ruling was so fundamentally unfair that it violated due process.  (Resp.  Mem. of P.&A. at 24.) In his traverse, Barno concedes that binding case law holds that " '[b]usiness records fall outside the core class of 'testimonial evidence,' and thus are not subject to the absolute requirement of confrontation established in *Crawford* [*v. Washington*, 541 U.S. 36 (2004)].' "  (Pet. Mem. of P.&A. ISO Traverse at 26.)

### A.  Applicable Legal Standard

Federal habeas relief is available for a state prisoner only on the ground that he is in custody in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67- 68. Accordingly, a habeas claim based on state law, such as erroneous application of state rules of evidence, is not cognizable on federal habeas review.  *Id.* at 67; *Gonzales v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir.1999); *Jammal*, 926 F.2d at 919 ("We are not a state supreme court of errors; we do not review questions of state evidence law").  "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995). Rather, the inquiry is whether the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair," in violation of due process. *Jammal*, 926 F.2d at 919.

The confrontation clause of the Sixth Amendment bars the state from introducing out-of-court statements which are testimonial in nature unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.  *Crawford,* 541 U.S. at 53-54.  The Supreme Court in *Crawford* specified that the confrontation clause *only* applied to hearsay that is testimonial in nature and specified that business records are an example on a nontestimonial statement.  *Id*. at 56; *see also United States v. Cervantes-Flores*, 421 F.3d 825, 832 (9th Cir. 2005) (quoting *Crawford*).

**B.  Application to Barno's Petition**

Count Eleven charged Barno with vandalism to Danielle Dotta's Honda Civic causing damage more than $400.  (CT 12, 36.) On direct examination, Dotta was asked about the damage to her car.  Dotta identified a copy of a bill she received for the repair work done on her car.  Barno's objection on hearsay grounds was overruled. (Lodgment 18 at 5 RT 590.) The repair bill, prepared by the Saturn dealership was for $2,563.  Dotta testified she paid her deductible and submitted the balance to her insurance company. (Lodgment 18 at 5 RT 591-92, 596-97.) Photographs showing the damage to Dotta's car and the repair bill were admitted into evidence. (Lodgment 18 at 5 RT 668, 763.)

In state court Barno argued: (1) that the repair bill was inadmissible hearsay and (2) that its admission violated his right to confront and cross-examine witnesses. The state appellate court rejected both contentions. (Lodgment 7 at 22-26.) The California Court of Appeal determined that the repair bill fell within the corroborative evidence exception to the hearsay rule for purposes of California Evidence Code section 1200, and was within the bounds of state law. (Lodgment 7 at 23-24.)  Pursuant to California law, the "corroborative evidence" exception to the hearsay rule allows admission of business records that would ordinarily be considered hearsay, such as invoices, bills and receipts to prove the amount of damages the plaintiff sustained.  (*Id.* (citing Pacific *Gas & Electric Co. v. GAWK Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 42-43 (1968)).

Even assuming that the evidentiary ruling was somehow erroneous, it was not so fundamentally unfair as to violate Barno's due process rights. *See Estelle*, 502 U.S. at 70.  A federal court cannot disturb on due process grounds a state court's decision to admit evidence unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.1986). In this

08cv2439-WQH

case the admission of the repair bill was not arbitrary and did not render the trial fundamentally unfair.

As the state court found, the repair bill fell within the corroborative evidence exception to the hearsay rule because Dotta testified that she received the bill, testified to the amount of the bill, as well as stated that she paid the amount of her insurance policy's deductible and her insurance company paid the remainder of the bill.  (Lodgment 7 at 24.) Thus, Barno does not have a federal constitutional claim on the basis of the trial court's evidentiary ruling.

Moreover, Barno fails to establish that his right to confrontation under the Sixth Amendment was violated by the trial court's admission of the repair bill into evidence. The state appellate court rejected Barno's claim that admission of the repair bill violated his right under the Sixth Amendment to confront and cross-examine witnesses under *Crawford*.  (Lodgment 7 at 26.) The state appellate court noted that under *Crawford*, business records are nontestimonial evidence.  (Lodgment 7 at 25-26 (citing *Crawford*, 541 U.S. at 56.) The state appellate court found the repair bill in this case was a business record and therefore not considered testimonial under *Crawford*. (Lodgment 7 at 26.)

The California Court of Appeal's determination that the repair bill was a business record and not testimonial under *Crawford* was not contrary to clearly established Supreme Court law.  In *Crawford*, the Court identified business records as nontestimonial hearsay.  *Crawford*, 541 U.S. at 56.  Moreover, the state courts' decision was not based on an unreasonable application of the law.  Accordingly, Barno's Confrontation Clause claim was reasonably rejected by the state court, and he is not entitled to federal habeas relief on this claim. 28 U.S.C. § 2254(d).

### 5.   THERE WAS SUFFICIENT EVIDENCE PRESENTED DURING TRIAL TO SUPPORT THE CONVICTIONS FOR MAKING CRIMINAL THREATS

In Ground Five, Barno argues that insufficient evidence was presented to convict him of making criminal threats against Matthew Ballester as charged in counts 6 and 7. (Pet. at 9A.)  Respondent contends that the "California Court of Appeal reasonably concluded that a rational trier of fact could readily have found Barno guilty beyond a reasonable doubt of making criminal threats to Matthew Ballester." (Resp. Mem. of P. & A. at 24.)  Respondent requests that the claim for federal habeas relief be denied because the state courts' denial of this claim was not contrary to or an unreasonable application of clearly established Supreme Court law.  (*Id*.)  Barno does not address this ground for relief in his traverse.

The criminal threats in counts 6 and 7 concern Daniell's boyfriend at the time, Matthew Ballester. (Lodgment 18 at 2 RT 236; 3 RT 342, 352.) Barno's phone records showed three calls were made to the Ballester's home and one call to Matthew Ballester's cell phone on February 20, 2003. (Lodgment 18 at 5 RT 709.) Five calls from Barno's phone were made to the Ballester's home on February 23, and a few calls were made from the phone to the Ballester's before and after those dates. (Lodgment 18 at 5 RT 682, 709.) Matthew testified he received threatening calls from Barno. (Lodgment 18 at 3 RT 342. ) In one call, the caller identified himself as Rodney Barno and asked about Daniell. (Lodgment 18 at 3 RT 344.) Matthew received more calls from the same person. Matthew testified that the caller told him that ". . . he was coming to get me, watch my back, going to fuck me up." On one occasion the caller warned, "Watch your back. I'm coming over." (Lodgment 18 at 3 RT 343-345.) In one of the calls, the caller asked for Daniell and recited Matthew's address. He then said, "If I went there, she wouldn't be there." (Lodgment 18 at 3 RT 349.)  Barno spoke by phone with Michael Ballester, Matthew's younger brother, and asked for Matthew. (Lodgment 18 at 2 RT 237, 239-240.) When Michael told Barno that Matthew could not come to the phone, Barno stated, "Tell your brother he's going to get fucked up." (Lodgment 18 at 5 RT 683.) Soon after this phone call, Barno called again, said, "So you think this is a joke?" "Well, tell your brother to stay away from my girl. I'm coming over there tonight." (Lodgment 18 at 5 RT 683; 2 RT 239-240, 242-243.) Michael told Matthew about both calls. (Lodgment 18 at 2 RT 242-243.) Matthew was upset. (Lodgment 18 at 2 RT 251, 252.) Matthew reported the calls he had received to the police the same night. (Lodgment 18 at 2 RT 244, 249-250, 253.)  Matthew told police that he was "very frightened" for his safety and for that of his family. (Lodgment 18 at 3 RT 369-370.) Matthew took Barno's calls seriously. (Lodgment 18 at 3 RT 349.) He took different routes home and stopped parking his truck in his driveway. (Lodgment 18 at 3 RT 351, 355.)

"[T]he crime of criminal threat is set forth in [California Penal Code] section 422. That statute provides in relevant part: 'Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made,

1  is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity

2  of purpose and an immediate prospect of execution of the threat, and thereby causes that person

3  reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety' is

4  guilty of a crime, which is punishable alternatively as a misdemeanor or a felony." *People v. Toledo,* 26

5  Cal.4th 221, 227 (2001).

6      Section 422 contains "five constituent elements that must be established to find that a defendant

7  has committed this offense. In order to prove a violation of section 422, the prosecution must establish

8  all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in

9  death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific

10  intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it

11  out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic

12  communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so

13  unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of

14  purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the

15  person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's

16  safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. *See*

17  *generally People v. Bolin*, 18 Cal.4th 297, 337–340 (1998); *Toledo*, 26 Cal. 4th at 227- 228.

18      As he did in his state appeal, Barno alleges the evidence failed to establish three elements

19  required to prove a violation of section 422. Specifically, he contends there was insufficient evidence

20  that: 1) he threatened to commit a crime that would result in death or great bodily injury; 2) the threat

21  was unequivocal, unconditional, immediate, and specific; and 3) the threat actually caused the person

22  threatened to be in sustained fear for his own safety or for his immediate family's safety. (Pet at 9A.)

23      The California Court of Appeal rejected Barno's claim and found substantial evidence had been

24  presented to establish each of the elements challenged by Barno. The court stated:

25      The evidence demonstrates that the threats by Barno, made directly through Ballester's
    brother, Michael, were threats "to commit a crime that would result in death or in great

26      bodily injury." Directly to Ballester, Barno stated that "he was going to get him," told him
    to "watch his back," and that he was going to "fuck him up." Through his brother

27      Michael, he again threatened to "fuck him up." The only reasonable interpretation of
    these threats was that Barno intended to cause great bodily injury to Ballester.

28
    Further, Barno's threats were so "unequivocal, unconditional, immediate and specific as to

24

convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat." The fact that Barno recited Ballester's address to him in one call conveyed to Ballester that the threat was immediate and could be carried out. After Barno told Ballester's brother Michael that he was going to "fuck up" his brother, he called back and said, "So you think this is a joke?", and stated that he was "coming over there tonight." This evidence amply supports element 3 of section 422.

Moreover, the evidence showed that the threats caused Ballester to be in sustained fear for his safety and that of his family. Section 422 does not define "sustained fear." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) However, the California Supreme Court has interpreted the term to mean "a period of time that extends beyond what is momentary, fleeting, or transitory." (*Ibid.*) Ballester testified that he took Barno's threats seriously. As a result of the threats, he took different routes home, paid more attention to what he was doing, and did not park his truck in the driveway. He was worried for himself and his family. He told police he was "very frightened for [his] safety and the safety of [his] family." His family took security precautions including closing their windows at night and placing a chain lock on the door. This evidence was sufficient to satisfy element 3, as Ballester's fear was for a period of time that was more than "momentary, fleeting, and transitory." Substantial evidence supports the counts 6 and 7 criminal threat convictions.

(Lodgment 7 at 35-36.)

### A. Applicable Legal Standard

The California standard for determining the sufficiency of evidence to support a conviction has been held by the California Supreme Court to be identical to the federal standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See People v. Johnson*, 26 Cal.3d 557, 576 (1980). Under this standard, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. In making this determination, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.1995); *see also Jackson*, 443 U.S. at 319, 324, 326.

### B. Application to Barno's Petition

The standard set forth above was the standard utilized by the Court of Appeal in rejecting Barno's claim. (Lodgment 7 at 32.) While the California Court of Appeal did not expressly refer to *Jackson*, that fact does not affect the application of the AEDPA standard. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (holding that a state court decision need not cite to the clearly established Supreme Court law, "so long as neither the reasoning nor the result of the state court decision contradicts [Supreme Court precedent]".) In its opinion, the California Court of Appeal stated that in assessing

25

1   Barno's insufficiency of evidence claim, it was reviewing "the whole record in the light most favorable

2   to the judgment to determine whether it discloses substantial evidence—that is, evidence that is

3   reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant

4   guilty beyond a reasonable doubt." (Lodgment 7 at 32.)  This is the same standard enunciated in *Jackson*,

5   thus, the state court's decision was not "contrary to" Supreme Court law—the *Jackson* standard.

6         The California Court of Appeal's decision reasonably applied the *Jackson* standard "with explicit

7   reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S.

8   at 324 n. 16. The state appellate court found that Barno conveyed the threats directly to Matthew

9   Ballester and through his brother, Michael. Matthew reasonably interpreted Barno's threat to him that he

10  would "fuck him up" to mean that he would inflict great bodily injury. Barno recited Matthew's address

11  to Matthew, from which a jury could reasonably find that Barno could and would carry out the threat

12  since he knew where Matthew lived. Matthew took the threats seriously and altered his life by taking

13  different routes home and not parking his truck in his driveway. He told police he feared for his safety

14  and that of his family. (Lodgment 7 at 34-35.) Based on the evidence presented at trial, the California

15  Court of Appeal reasonably concluded that a rational fact finder could readily have found Barno guilty

16  beyond a reasonable doubt of making criminal threats to Matthew Ballester. Accordingly, the denial of

17  this claim by the state court was not an unreasonable application of the *Jackson* standard. Thus, habeas

18  relief is not warranted on this claim.

19      **6.**    **THE TRIAL COURT'S FAILURE TO SUA SPONTE INSTRUCT ON AIDING AND ABETTING**
                  **LIABILITY WAS NOT IN ERROR**

20        Barno contends that the trial court committed prejudicial error by not sua sponte instructing the

21  jury on aiding and abetting liability with respect to the stalking charges in counts 1 and 2.  Barno argues

22  that an aiding and abetting instruction was required because there was evidence that he did not make all

23  of the threatening phone calls to Daniell and her mother, Helen. (Pet. at 9B.)  According to Barno, the

24  evidence suggests an unidentified female made some of the phone calls, and that Helen testified she

25  received calls from male individuals she could not identify. (Lodgment 18 at 1 RT 46. ) Barno further

26  contends that because he "was prosecuted, at least in part, for criminal acts perpetrated by other people,

27  the trial court committed error by failing to instruct on principles of aiding and abetting." (Pet. at 9B.)

28  Respondent attests that there was no error because there was no factual basis to instruct the jury on

1  aiding and abetting and that any alleged error is not cognizable on federal habeas review because the

2  error is merely an issue of state law. (Resp.  Mem. of P. & A. at 30.) In addition, Respondent argues that

3  in the event the court finds error, the error does not warrant habeas relief because it did not have a

4  "substantial and injurious effect or influence in determining the jury's verdict."  (*Id.* at 31 (citing *Brecht*

5  *v. Abrahamson*, 507 U.S. 619, 637-38).)  Barno does not address this ground for relief in his traverse.

6       The California Court of Appeal found that the trial court did not err in omitting aiding and

7  abetting liability instructions. The Court explained:

8       [T]here was no evidence in the record that Barno was prosecuted on an aiding
        and abetting theory as to counts 1 and 2. Rather, the record is clear that the People
9       based their case for these counts on Barno's actions, not the actions of others. Indeed,
        as noted, ante, defense counsel admitted Barno committed these acts, but argued they
10      only warranted misdemeanor, not felony, convictions. The court did not err in failing
        to instruct on aiding and abetting.

11  (Lodgment 17 at 36.)

12       **A.  Applicable Legal Standard**

13       To the extent Barno challenges the trial court's application of California law in failing to sua

14  sponte instruct the jury regarding aiding and abetting liability, he has not stated a claim cognizable on

15  federal habeas review. *See, e.g.*, 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68 (reiterating that "it is not

16  the province of a federal habeas court to reexamine state court determinations on state law questions ");

17  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir.1996).

18       A state court's jury instructions violate due process if they deny a defendant "a meaningful

19  opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 690 (1986)*.* Thus, the

20  failure to instruct on a defense theory violates due process if the theory is legally sound and evidence in

21  the case makes the theory applicable.  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).  "Where the

22  alleged error is the failure to give an instruction, the burden on the petitioner is 'especially heavy.'"

23  *Hendricks v. Vasquez*, 974 F.2d 1099, 1106 (9th Cir.1992) (quoting *Henderson v. Kibbe*, 431 U.S. 145,

24  155 (1977). "The omission of an instruction is 'less likely to be prejudicial than a misstatement of the

25  law.'" *Walker v. Endell,* 850 F.2d 470, 475-76 (9th Cir. 1987) (quoting *Henderson*, 431 U.S. at 154).

26  Moreover, the alleged error must be considered in the context of the instructions as a whole and the

27  entire trial record. *Estelle*, 502 U.S. at 72; *United States v. Frady*, 456 U.S. 152, 16 (1982); *Cupp v.*

28  *Naughten*, 414 U.S. 141, 147 (1973).  Habeas relief is only available if an error occurred and if that error

had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

### B.  Application to Barno's Petition

That state courts did not find error in the trial court's failure to sua sponte give an aiding and abetting instruction.  There is nothing in the record to indicate that Barno was constitutionally entitled to an aiding and abetting instruction as part of a theory of the defense.  Barno concedes that the defense did not ask for an aiding and abetting instruction and merely argues that the court should have instructed the jury on that theory sua sponte.  Moreover, at trial the defense theory was not based on aiding and abetting, but on the theory that Barno's acts only warranted misdemeanor convictions. Thus, the state appellate court properly found there was no factual basis to instruct the jury on aiding and abetting liability on these stalking counts.  The California courts' rejection of Barno's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court because there was no evidence to support giving an aiding and abetting instruction.

Even assuming, *arguendo*, that the state court erred in failing to give the alleged instructions, Barno is not entitled to habeas relief because the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-38 (error is harmless if it did not have substantial and injurious effect or influence in determining jury's verdict); *see also Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002).  As noted by the California Court of Appeal, the record demonstrates the prosecution based its case regarding the stalking of Daniell and her mother, Helen, on Barno's actions, not on the actions of others. At trial, Barno did not deny he made calls to Daniell and her mother. (Lodgment 18 at 8 RT 859, 881, 883.)

Habeas relief is not warranted on this claim because Barno has not demonstrated that a federal constitutional violation occurred.

### 7.  BARNO IS NOT ENTITLED TO HABEAS RELIEF ON HIS CUMULATIVE ERROR CLAIM

In Ground Seven, Barno alleges the cumulative effect of the trial court's erroneous evidentiary rulings combined with instructional error, rendered his trial fundamentally unfair and violated his right to due process. (Pet. at 9C.)  Respondent contends that Barno's claim of cumulative trial errors does not

1  provide a basis for federal habeas relief. (Resp.  Mem. of P. & A. at 32.) Barno does not address this

2  ground for relief in his traverse.

3  **A.  Applicable Legal Standard**

4  The Supreme Court has long recognized that "given the myriad safeguards provided to assure a

5  fair trial, and taking into account the reality of the human fallibility of the participants, there can be no

6  such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." *United*

7  *States v. Hasting*, 461 U.S. 499, 508-509 (1983). It is the duty of a reviewing court to consider the trial

8  record as a whole and to ignore errors that are harmless, including most constitutional violations. *Id*.

9  AEDPA mandates that habeas relief may only be granted if the state courts have acted contrary to, or

10 have unreasonably applied federal law as determined by the United States Supreme Court. *See Williams*,

11 529 U.S. at 412 ("Section 2254(d) (1) restricts the source of clearly established law to [the Supreme]

12 Court's jurisprudence.").

13 In some cases, the combined effect of multiple trial errors may give rise to a due process

14 violation if the trial was rendered fundamentally unfair, even where each alleged error considered

15 individually would not require reversal. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.2007) (citing

16 *Donnelly v. Dechristoforo*, 416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 290

17 (1973)). Thus, The cumulative effect of multiple errors can violate due process even where no single

18 error rises to the level of a constitutional violation or would independently warrant reversal. *Parle*, 505

19 F.3d at 927 (citing *Chambers v. Mississippi*, 410 U.S. 284, 290 n. 3 (1973). The fundamental question in

20 determining whether the combined effect of trial errors violated a defendant's due process rights is

21 whether the errors rendered the criminal defense "far less persuasive," *Chambers*, 410 U.S. at 294, and

22 thereby had a "substantial and injurious effect or influence" on the jury's verdict. *Parle*, 505 F.3d at 927

23 (quoting *Brecht*, 507 U.S. at 637).

24 **B.  Application to Barno's Petition**

25 As discussed above, Barno suffered only one trial error and that error was deemed harmless.

26 Thus, there is no combined effect of errors to be reviewed. The California Court of Appeal's decision on

27 this issue was not contrary to or an unreasonable application of clearly established Supreme Court law.

28 As such, Barno is not entitled to federal habeas corpus relief on this claim.

1
        **8.**    **BARNO'S ACTUAL INNOCENCE CLAIM DOES NOT PROVIDE FOR HABEAS RELIEF**

2
        Barno presents a free-standing actual innocence claim. In other words, he does not assert actual

3
innocence as a procedural gateway to get past a procedural bar. Instead, he alleges that "newly

4
discovered evidence," proves he is actually innocent of the crimes that he was convicted. (Pet at 9D-

5
9M.)  Respondent argues that Barno's actual innocence claim is not cognizable on federal habeas

6
review, and in the alternative, that even assuming a freestanding actual innocence claim is a permissible

7
ground for habeas relief, Barno fails to satisfy the extraordinarily high threshold required to prevail on

8
such a claim.  (Resp.  Mem. of P.&A. at 34, 36.)

9
        **A.  Barno's Actual Innocence Claim Is Not Cognizable on Federal Habeas Review**

10
        Because Petitioner has not alleged an independent constitutional violation, this is a freestanding

11
claim of actual innocence. The United States Supreme Court has never held that a freestanding claim of

12
actual innocence is cognizable on federal habeas review. *Herrera v. Collins*, 506 U.S. 390, 400 (1993)

13
("[T]he existence merely of newly discovered evidence relevant to the innocence of a state prisoner is

14
not a ground for federal habeas corpus relief."); *see also House v. Bell*, 547 U.S. 518, 545–55 (2006)

15
(declining "to answer the question left open in *Herrera*" of whether "freestanding innocence claims are

16
possible").

17
        Because the Supreme Court has never held that a freestanding claim of actual innocence is

18
cognizable on habeas, the state courts' denial of this claim could not be contrary to, or an unreasonable

19
application of, clearly established United States Supreme Court law. *See Richter*, 131 S.Ct. at 786. As a

20
result, Barno's claim fails.

21
        **B.  Even Assuming Barno's Claim is Cognizable on Federal Habeas Review, He Has Not Satisfied the "Extraordinarily High" Standard Necessary to Prevail**

22
        The Ninth Circuit has assumed, but not established, that freestanding actual innocence claims are

23
cognizable in both capital and non-capital cases.  *Osborne v. District Attorney's Office for Third Judicial*

24
*Dist.*, 521 F.3d 1118, 1131 (9th Cir. 2008) (*overruled on other grounds by District Attorney's Office for*

25
*Third Judicial Dist. v Osborne,* 129 S.Ct. 2308 (2009).  The Ninth Circuit has held that, to prevail on

26
such a claim, a petitioner must go beyond demonstrating doubt about his guilt and must affirmatively

27
prove that he is probably innocent. *See Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc);

28
*see also Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000).

### 1.  Applicable Legal Standard

In order to prevail on a claim of actual innocence, Barno's burden is "extraordinarily high" and requires a showing that is "truly persuasive." *Carriger*, 132 F.3d at 476.  "[A] habeas petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.*

### 2.  Application to Barno's Petition

Barno's additional evidence fails to meet the high standard enunciated in *Carriger*.  Barno raised his freestanding actual innocence claim in his state court habeas petitions.  Barno's actual innocence claim was rejected by the state courts. (Lodgment 21, 14.) The superior court, in the last reasoned state court decision on this claim, stated: "Based on the totality of the circumstances, the declarations do not cast fundamental doubt on the accuracy and reliability of the proceedings . . . ."  (Lodgment 21 at 7.) Stated a different way, the declarations submitted in support of Barno's actual innocence claim do not affirmatively prove that Barno is probably innocent.  *Carriger*, 132 F.3d at 476.

 The declarations addressed below were submitted with Barno's instant petition as well as his state court habeas petitions.  The declarations were offered in support of his claim that he was not the perpetrator of the crimes.  (Pet. Exs. J, K, M, N, O, P, Q, R, S, T, U. )

#### a.  Richard Seffens

With regard to the uncharged act against Jasmin Loy, Barno now has a witness, Richard Seffens, who corroborates Barno's statements to the police. Mr. Seffens was on active parole in 2001, at the time of the incident, and did not want to come forward out of fear of retaliation by law enforcement and parole authorities. (Pet. Ex. T.)  Mr. Seffen declares he observed the incident from across the street at his residence. He opines that Barno did not intentionally burn Loy with a cigarette. (*Id*.)  Mr. Seffens prepared this declaration on May 26, 2008—more than seven years after the cigarette incident took place.

This event, however, was not a charged offense that the jury found Barno guilty of at trial.

#### b.  Lacee Christoffersen

As to the vandalism of Daniell's vehicle and her mother's vehicle, Barno has submitted Lacee Christoffersen's 2003 declaration stating that Barno was at home with her and his brother Chris when

1    the vandalism incidents occurred. (Pet. Ex. K.)

2         With regard to the tampering of Daniell's tires on April 25, 2003, which was used to establish the

3    stalking charge, Lacee Christoffersen's 2008 declaration states that she and Chris Barno did this act

4    without Barno's knowledge. (*Id*.)  And with regard to the vandalism of Danielle Dotta's vehicle, Lacee

5    Christoffersen declares she committed the offense with Sarmad Barno. In addition, she declares that she

6    witnessed Chris Barno make phone calls to Ms. Anaya-Rioux on February 25 and 26, 2003.  Ms.

7    Christoffersen also admits to making the hang-up calls to Ms. Anaya-Rioux on May 2, 2003, and that

8    she made the calls without Barno's knowledge.  (Pet. Ex. K.)

9                      c.  Chris Barno, Gabriel Barno, Samrad Barno, Anthony Barno

10        In declarations, Barno's family members claim that they are responsible for some of the criminal

11   acts that the jury found Barno guilty of committing.

12        In 2008, Barno's brother, Chris, completed a declaration stating that he made the harassing calls

13   to Ms. Anaya-Rioux on February 25 and 26, 2003. (Pet. Ex. J at ¶ 9.)  He also declares he made the

14   criminal threat against Matthew Ballester via Michael Ballester during the phone call on February 25,

15   2003. (Pet. Ex. J at ¶ 8.)  He does, however, admit that he made these calls from Barno's telephone.

16   (*Id*.)

17        In addition, Chris Barno declares he made the criminal threats against Suzanne Eliasson and

18   Robert Eliasson in retaliation because he believed Robert Eliasson vandalized his vehicle. (Pet. Ex. J.)

19   Finally, Chris Barno declares he vandalized the Laverty vehicles with Anthony Barno in retaliation for

20   Frances Laverty telling police that the Barno's had weapons at their home. (Pet. Ex. J at ¶¶ 11-12.)

21        Barno's father, Gabriel Barno, declares he made the call to Ms. Helen Anaya-Rioux on March

22   29, 2003 phone call. (Pet. Ex. M at ¶ 3.)  This declaration was made in October 2008, nearly four years

23   after Barno's trial.  He does not admit to threatening Ms. Anaya-Rioux.  (Pet. Ex. M at ¶ 3.)

24        Sarmad Barno declares he made the call to Ms. Anaya-Rioux on May 8, 2003. (Pet. Ex. N at

25   ¶ 10.) But he does not admit to threatening anyone's life.  Sarmad Barno also declares he made the

26   voice disguised phone call to Daniell on May 17, 2003. (Pet. Ex. N at ¶ 14.)  He claims he kept this

27   information a secret until a prison visit to Barno in 2008 and did not sign his declaration until 2008—far

28   more than three years after the harassing calls were made.  (*Id*.)

Anthony Barno declares that he made prank calls to Jessica Gresch and vandalized her car.  (Pet. Ex. R.)  He also declares he threw a rock through a Laverty car window on May 7, 2003.  (*Id.*)  He claims that he did not come forward at the time Barno was prosecuted and admit his role in the crime because the crime was charged as a felony and he did not want to be "held responsible for some of the things Rodney was convicted of doing . . . and [he] did not want to get into trouble."  (*Id.*)  He signed this declaration in September 2008, more than three years after the crimes were committed.

e.  Hajar Sulaiman

Hajar Sulaiman declares that he was with Sarmad Barno when the call was made to Ms. Anaya-Rioux on May 8, 2003. (Pet. Ex. O at ¶ 3.)  He does not admit that death threats were made.  He also declares that he was with Sarmad Barno when the voice disguised calls were made to Daniell on May 17, 2003.  (Pet. Ex. O at ¶ 4.)  He declares Barno did not have anything to do with these two calls.  (Pet. Ex. O at ¶ 5.)

f.  Brandon Drake

Brandon Drake's June 2008 declaration merely states that he saw Barno at Barona Casino in early February 2003. (Pet. Ex. S.)  This statement, however, is not "affirmative proof" of innocence.  *See Carriger,* 132 F.3d at 476-77.

In a well reasoned decision, the superior court determined that the "declarations from third parties taking responsibility for the criminal acts [Barno was convicted of" do not qualify as 'newly discovered evidence.'"  (Lodgment 21 at 5.)  As mentioned above, the court further found that the declarations do not cast fundamental doubt on the accuracy and reliability of the proceedings.  (Lodgment 21 at 7.)  The California Court of Appeal also determined that the declarations "[do] not cast fundamental doubt on the accuracy or reliability of the proceedings."  (Lodgment 17 at 2.)

Other than Richard Seffens' declaration regarding the cigarette incident with Jasmin Loy, all of the other declarants are Barno's family members or friends.  The declarations confessing to crimes were made approximately four years after Barno was convicted of those crimes.   Pursuant to California Penal Code section 801, the statute of limitations for prosecuting the crimes Barno's friends and family have confessed to committing is three years.  Cal. Penal Code § 801.  Thus, it is suspect that the witnesses waited until the statute of limitations on these crimes expired before submitting declarations confessing

1   to these incidents.  Moreover, it strains credulity that none of these declarants offered this testimony at

2   Barno's trial in 2004.

3        None of this purported "evidence" is the kind of reliable and credible evidence that affirmatively

4   proves Barno's innocence.  *See Herrera* ,506 U.S. at 423, (O'Connor, J. concurring) (post-trial affidavits

5   "are to be treated with a fair degree of skepticism"); *Baran v. Hill*, 2010 WL 466153, at *7 (D. Or.

6   Feb.9, 2010) (finding that petitioner's self-serving and unsupported statements were not "new and

7   reliable" evidence sufficient to prove actual innocence); *McArdle v. Sniff*, 2009 WL 1097324, at *5

8   (C.D. Cal. Apr.20, 2009) (same); *Porter v. Adams*, 2007 WL 2703195, at *9 (E.D. Cal. Sept.14, 2007)

9   (finding "new" evidence unreliable to support actual innocence claim, where petitioner had "simply

10  provided his own self-serving declaration, corroborated by declarations from his cousin and his cousin's

11  cousin," dated five years after petitioner's conviction).

12       Even if the factual portions of the declarations do constitute reliable evidence, at best they do no

13  more than cast doubt on Barno's guilt. It is not probable that the admission of these statements at trial

14  would have resulted in his acquittal. Considering the newly discovered evidence in combination with the

15  other evidence presented at trial, Barno has failed to demonstrate that he is probably innocent. *See, e.g.,*

16  *Herrera*, 506 U.S. at 417–18 (affidavits "given over eight years after petitioner's trial[,] . . . must be

17  considered in light of the proof of petitioner's guilt at trial"); *Carriger*, 132 F.3d at 477 ("[T]he [third

18  party] confession by itself falls short of affirmatively proving that [the petitioner] more likely than not is

19  innocent."); *Cress v. Palmer*, 484 F.3d 844, 855 (6th Cir.2007) (holding petitioner failed to satisfy

20  "hypothetical *Herrera* standard" with new evidence, including "a confession from someone who was

21  strongly motivated to confess falsely for ulterior reasons").  As addressed above, there was significant

22  evidence presented at trial such that this "newly discovered evidence" falls short of proving that Barno is

23  more likely than not innocent of the charges.

24       For all of the above stated reasons, Barno has not shown that the California courts' adjudication

25  of his actual innocence claim was contrary to, or an unreasonable application of clearly established law.

26  Accordingly, Barno is not entitled to federal habeas relief on his actual innocence claim.

27  ///

28  ///

1       **9.**     **INEFFECTIVE ASSISTANCE OF COUNSEL**

2       Barno complains his trial counsel was constitutionally ineffective because he failed to

3 investigate; failed to present witnesses; evidence or a defense; failed to object to damaging evidence; and

4 erred by conceding Barno's guilt on some counts. (Pet. at 23.)  In Ground Eleven Barno also argues that

5 the cumulative effect of trial counsel's errors violated his right to effective assistance of counsel.  (Pet. at

6 64.) Respondent argues that Barno cannot show that his counsel's performance was either deficient or

7 that the result of the trial would have been different had counsel acted differently.  (Resp.  Mem. of

8 P.&A. at 40, 48)

9       **A.  Legal Standard—Ineffective Assistance of Counsel**

10       Barno's allegations of ineffective assistance of counsel were considered and rejected by the

11 state courts on habeas review. (Lodgments 14 at 2, 16; Lodgment 20 at 8-15.) Therefore, this Court will

12 look through to the superior court's decision because it is the last reasoned decision pertaining to this

13 ground for relief. *Ylst*, 501 U.S. at 801-06 (1991).  Under AEDPA's highly deferential standard of

14 review, this Court evaluates the state court's decision to see if the decision was contrary to or an

15 unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1); *Richter*, 131 S.Ct at

16 785-86 (applying 28 U.S.C. § 2254(d)(1) to federal habeas review of state court's determination of an

17 ineffective assistance of counsel claim).

18       On federal habeas review of an ineffective assistance of counsel claim previously adjudicated by

19 a state court, the applicable clearly established Supreme Court law for purposes of AEDPA review is the

20 standard articulated in *Strickland v. Washington*. *Richter*, 131 S.Ct 770 at 778.  As articulated in

21 *Strickland*, the Sixth Amendment guarantees the effective assistance of counsel at trial. *Strickland v.*

22 *Washington*, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of counsel, a

23 petitioner must show: (1) the counsel's performance was deficient, and (2) that the deficient performance

24 prejudiced petitioner's defense. *Id*. at 688.

25       To prevail, the claimant must demonstrate that counsel failed to exercise reasonable professional

26 judgment and resulting prejudice. *Id.* at 694.  First, the petitioner must show that counsel's performance

27 was deficient, which requires a showing that counsel made errors so serious that counsel was not

28 functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.* at 687.  The

1   petitioner must show that counsel's representation fell below an objective standard of reasonableness,

2   and must identify counsel's alleged acts or omissions that were not the result of reasonable professional

3   judgment considering the circumstances.  *Id.* at 688.  There is a strong presumption that counsel's

4   conduct fell within the broad range of reasonable professional assistance.  *Id.* at 690.

5        Second, the petitioner must demonstrate "that there is a reasonable probability that, but for

6   counsel's  unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694; *see*

7   *Richter*, 131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just

8   conceivable").  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was

9   unreasonable."  *Id.* at 791-92 (reversing a Ninth Circuit *en banc* grant of habeas relief on an ineffective

10  assistance claim for lack of sufficient deference to a state court result).

11       As the Supreme Court reaffirmed in *Harrington v. Richter*, meeting the standard for ineffective

12  assistance of counsel in federal habeas is extremely difficult:

13       The pivotal question is whether the state court's application of the *Strickland*
         standard was unreasonable.  This is different from asking whether defense
14       counsel's performance fell below *Strickland's* standard.  Were that the inquiry, the
         analysis would be no different than if, for example, this Court were adjudicating a
15       *Strickland* claim on direct review of a criminal conviction in a United States
         district court.  Under AEDPA, though, it is a necessary premise that the two
16       questions are different.  For purposes of § 2254(d)(1), "an unreasonable
         application of federal law is different from an incorrect application of federal
17       law." [citation omitted].  A state court must be granted a deference and latitude
         that are not in operation when the case involves review under the *Strickland*
18       standard itself.

19  *Richter*, 131 S.Ct at 785-86.

20       Thus, when a state court has rejected an ineffective assistance of counsel claim, as it has in this

21  case, a federal habeas court's review is "doubly deferential" under AEDPA.  *Yarborough v. Gentry*, 540

22  U.S. 1, 6 (2003).  Accordingly, even if a petitioner presents a strong case of ineffective assistance of

23  counsel, this Court may only grant relief if "no fairminded jurist could agree on the correctness of the

24  state court's decision."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

25                     **B. The State Courts Reasonably Denied Barno's Claim**

26       On Barno's state habeas petition, the superior court articulated  the legal standard for its review

27  of ineffective assistance of counsel as follows:

28       "To establish a claim of inadequate assistance, a defendant must show counsel's
         representation was 'deficient' in that it 'fell below an objective standard of

                                              36

reasonableness . . . under prevailing norms.' *Strickland, supra,* 466 U.S. at p. 688; *In re Jones* (1996) 13 Cal4th 552, 561.)  In addition, a defendant is required to show he or she was prejudiced by counsel' deficient representation.  (*Strickland, supra,* 466 U.S. at p. 688; *Ledesma, supra,* 43 Cal.3d at p. 217.) In determining prejudice, we inquire whether there is a reasonable probability that, but for counsel's deficiencies, the result would have been more favorable to the defendant." (*Strickland, supra,* 466 U.S. at p. 687; *In re Sixto* (1989) 48 Cal.3d 1247, 1257.)

(Lodgment 21 at 8.)

The court then applied the standard articulated in *Strickland* to the facts of Barno's case:

In his petition, Petitioner has set forth several areas where he believes trial counsel provided ineffective assistance of counsel.  After a review of all the allegations set forth in the petition, this court finds that Petitioner has not set forth grounds for relief based on ineffective assistance of counsel.  Even if the court assumes that all of the alleged deficiencies are true, Petitioner has not shown sufficient prejudice to warrant a reversal of the conviction.  There are not sufficient facts to show that counsel's performance rendered the result of the trial unreliable or the proceeding fundamentally unfair.

(Lodgment 21 at 11.)

The court went on to address the specifics of each of Barno's allegations regarding trial counsel's ineffectiveness:

In the present petition, Petitioner claims counsel failed to investigate Petitioner's alibi witnesses, the lack of evidence concerning some of the phone calls, impeachment evidence against some of the prosecution witnesses, and failed to present any witnesses on Petitioner's behalf.

With regard to the failure to present witnesses, Petitioner has not shown that he was prejudiced.  Petitioner has submitted declarations in which other persons are now attempting to take responsibility for a number of the acts and claim that they were the perpetrators of the crimes. However, Petitioner has not shown that these witnesses were available and willing to testify, what their actual testimony would have been at trial, or that their testimony would have assisted Petitioner.  These declarants are now attempting to admit they committed criminal acts.  If they were called to testify at trial, Petitioner has not shown that these declarants would have waived their Fifth Amendment Right not to incriminate themselves and would have testified under oath that they committed the crimes.  Some of the declarants have stated in their declarations that they did not come forward earlier due to the fact that they did not want to get in trouble. As they allegedly were not willing to admit their involvement to Petitioner during the pendency of the trial, it is reasonable to conclude that they would also not be willing to admit their criminal acts while under oath during this trial.

With regard to the lack of phone call evidence, the exhibits do show that counsel addressed this issue during the trial and attempted to establish that the evidence did not conclusively establish Petitioner made all the phone calls.  However, the prosecution claimed that Petitioner, in addition to using his own phone, used other persons' phones to make the calls.  As such, the evidence showing that Petitioner's own phone was not used to make calls on certain dates and times would not conclusively prove Petitioner did not make the calls.  Accordingly, Petitioner has not established ineffective assistance of counsel, as counsel did defend Petitioner on this issue.With regard to Petitioner's claim that counsel was ineffective for failing to object to evidence, Petitioner has not shown how this decision by counsel was not a knowledgeable choice of tactics.  The trial

transcripts show that the People's motions to admit uncharged crimes evidence were granted with some limitations after argument by defense counsel.  It appears that defense counsel then decided to take the tactic to try and get all evidence admitted in an attempt to get the fact that this was a three strikes case before the jury and make the jury aware of the sentence Petitioner was facing.  Counsel's tactics were done in consideration of the ruling the court made over his objection.  Thus, Petitioner has not shown that defense counsel's decisions regarding what evidence he would object to after the court made the in limine rulings was not a trial tactic fully considered by defense counsel to assist in defending Petitioner.

With regard to the impeachment evidence against Mr. Eliasson, the record shows that the inconsistency between Mr. Eliasson's testimony and his mother's testimony was addressed in front of the jury.  The record also shows that defense counsel did request evidence regarding a prior assault regarding Mr. Eliasson from the prosecution . . . .  Thus, the record shows that counsel did attempt to impeach Mr. Eliasson with the prior incident and did so to the extent the court permitted.

With regard to the Petitioner's claim that counsel's manner in conducting his cross-examination of witnesses was incompetent, Petitioner has not shown grounds for relief.  A review of the record shows that counsel cross-examined prosecution witnesses and attempted to discredit their testimony during cross-examination. . . .The fact that counsel was unable to discredit all of the witnesses in the eyes of the jury does not show counsel was ineffective.

Further, the fact that defense counsel made the decision to rest the case without presenting any evidence does not establish ineffective assistance of counsel . . . .  Counsel's decision to base the defense strategy on the cross-examination and impeachment of the prosecution's witnesses does not establish that counsel's decision was not a rational and informed decision.  The fact that there was no affirmative evidence does not show prejudice per se.  In fact, such a strategy is an ageless, frequently recommended defense trial tactic.  Petitioner has not established that his counsel was ineffective for choosing such a tactic.

Counsel's decision to concede Petitioner's guilt on some counts, in an effort to establish that the conduct was only misdemeanor conduct, during closing argument also does not establish ineffectiveness.  The transcript from the closing argument established that defense counsel determined that the evidence was overwhelming against Petitioner and the best strategy was to concede guilt on some of the charges and attempt to establish the conduct did not rise to a felony. . . . The fact that the jury found the Petitioner's acts were felonious does not establish counsel was ineffective for using the tactic he did during the closing argument.

With regard to Petitioner's claim that defense counsel failed to file a motion to suppress phone records, Petitioner has not shown grounds for relief.  Petitioner has not established the legal authority upon which the records could have been suppressed . . . .

(Lodgment 21 at 11-15.)

The superior court concluded that Barno failed to establish "a prima facie showing that his trial counsel committed 'error of constitutional magnitude that led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner.' (*In re Clark* (5 Cal.4th 750, 797 (1993).) " (Lodgment 21 at 15.)  The California Court of Appeal also rejected Barno's claim, finding that no prejudice had been established because Barno had failed to show that, but for counsel's conduct or omissions, Barno would have obtained a more favorable outcome. (Lodgment 14 at

08cv2439-WQH

2.)

The state courts applied the appropriate standard of review as required by *Strickland*, and their decisions were based on a reasonable determination of the facts as presented in the state court proceeding. Barno has not shown that the California state courts' denial of any of his ineffective assistance of counsel claims was objectively unreasonable. Nor has Barno established that had trial counsel acted differently, it would have been reasonably likely to produce a different result.

In addition, this Court cannot properly second-guess trial counsel's tactical choices. *Matylinsky v. Budge*, 577 F.3d 1083, 1092 (9th Cir. 2009). Therefore, this Court cannot conclude that the California courts unreasonably applied federal law or unreasonably determined the facts as presented when rejecting Barno's ineffective assistance of counsel claim. Because fairminded jurists could agree on the correctness of the state courts' decision, Barno is not entitled to habeas relief. 28 U.S.C. § 2254(d); *Strickland*, 466 U.S. 687; *Alvarado*, 541 U.S. at 664.

For the same reasons as stated above, Barno's claim in Ground Eleven alleging cumulative error based on trial counsel's multiple alleged errors must be rejected as without merit. (Pet. at 64; Doc. No. 99-2.) *See Ennic v. Neven*, 415 Fed. Appx. 794, 797 (9th Cir. 2011) (rejecting cumulative error contention where petitioner failed to show individual act of ineffective assistance of counsel). Barno has not shown that counsel made one error, let alone more than one error, thus even if clearly established federal law mandated a cumulative-effect analysis of ineffective-assistance of counsel claims, Barno would not be entitled to relief.

### 10. FALSE OR PERJURED TESTIMONY

In Ground Ten, Barno alleges he was denied due process because the prosecutor presented false evidence and perjured testimony to the jury. (Pet. at 63.) Respondent contends that the claim lacks merit because in order to prevail on a false evidence claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." (Resp. Memo of P.&A. at 48.) According to Respondent, Barno has not shown that the testimony was actually false, that the prosecution knew or should have known that the testimony was false, or that the false testimony was material.

///

## A.  Applicable Legal Standard

To prevail on a false evidence claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony [or evidence] was actually false, and (3) that the false testimony [or evidence] was material." *Hovey v. Ayers*, 458 F.3d 892,916 (9th Cir. 2006); *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003.) False evidence is material "if there is any reasonable likelihood that the false [evidence] could have affected the judgement of the jury." *Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010).  But mere speculation regarding these factors is insufficient to meet the petitioner's burden.  *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991).  And mere inconsistencies in testimony are not sufficient to establish that the testimony was perjured or that the prosecutor knowingly used perjured testimony. *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995); *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1992).  Additionally, the fact that testimony differs from statements made at other hearings does not establish falsity.  *Zuno-Arce*, 44 F.3d at 1423.

## B.  Application to Barno's Petition

Barno claims Jessica Grech told police and the prosecutor that statements she made in the past were false and that she only accused Barno of threatening her because she was angry at him and lied about it to appease her parents. (*See* Pet. Ex. E [Decl. of Jessica Grech].)

In a reasoned decision, the superior court denied Barno's false evidence claim, finding that he was not entitled to relief because he did not establish that false evidence was presented at his trial. (Lodgment 21 at 16.) The court observed that the fact Ms. Grech recanted her prior version of an incident did not establish that the prosecution had introduced false testimony. The superior court stated:

> The People have the right to present the testimony and impeach the witness with her prior inconsistent statements. It is then the jury's duty to decide which version of the witness' story is more credible. In addition, the prosecution has the authority to inform a witness of the consequences of lying under oath and the discretion to offer a witness immunity.

(Lodgment 21 at 16.)

The superior court also addressed Barno's claim that the restraining order was obtained by false statements and that Ms. Laverty testified falsely at the criminal trial:

> Ms. Laverty's statements in her declaration do not establish that she testified falsely in the restraining order proceedings and in the criminal trial. Even if the court were to assume Ms. Laverty's recantation was credible, based on the totality of the evidence, Petitioner has not shown that the testimony was of such significance it may have affected the

40

08cv2439-WQH

1   outcome of the trial.

2   With regard [to] Petitioner's claim that the prosecution was aware the restraining order
    was obtained with perjured statements, Petitioner has not shown grounds for relief.
3   Petitioner's claim that the witnesses knowingly lied is based on his version of the event
    and his interpretation of the evidence. The fact that he believes the evidence does not
4   support the allegations made by the witnesses does not establish the prosecution used
    perjured testimony. The allegations were found credible by the court issuing the
5   restraining order. The prosecution has the right to rely on the court's finding and the
    issuance of the restraining order to support Petitioner's criminal prosecution. Again, the
6   fact that witnesses are now recanting their statements does not establish the testimony is
    false and should not have been presented to the jury.

7   (Lodgment 21 at 16-17.)

8          And Barno's claim that the prosecutor introduced false testimony by Danielle Dotta with regard

9   to the cost of damages to her car was also considered and rejected by the superior court. In her

10  declaration, Dotta states that she was not sure of the exact dollar amount of the damage to her car; that

11  she had no personal knowledge of the billing system used by the repair shop; that she did not personally

12  bill her insurance company; she had no personal knowledge of what fees were paid by her insurance

13  company or the repair shop; and the car repair shop submitted an invoice to the insurance company. (Pet.

14  Ex. F [Decl. of Danielle Dotta].)

15         The superior court considered Dotta's declaration and stated that Barno had not "presented any

16  evidence that Ms. Dotta's testimony regarding the manner in which the vehicle damages were paid was

17  false or that the evidence created a different result." (Lodgment 21 at 17.) The court further found that

18  Barno had failed to show that the total damages to Ms. Dotta's car did not exceed $400. (*Id*. at 17.)

19  There was no dispute the damages to Dotta's car exceeded $400. The repair bill given to Dotta by the

20  Saturn Dealership where she had her car repaired, showed $2,228.28 paid by the insurance company for

21  repair work. (Lodgment 18 at 5 RT 592.) At trial, Dotta identified a copy of the bill she received for the

22  repair work done on her car. She stated the bill was for $2,563. She said she paid her deductible and

23  submitted the balance to her insurance company. (Lodgment 18 at 5 RT 591-92, 596-97.)

24         In denying the false and perjured testimony claim on habeas review, the state superior court

25  found that the witnesses did not testify falsely, therefore, Barno's claim did not have merit. The

26  California Court of Appeal also rejected the false evidence claim and denied Barno habeas relief on this

27  ground. (Lodgment 14 at 1-2.) As noted by the superior court, the mere fact a witness may give

28  inconsistent statements or recants an earlier version of the event, is not sufficient to establish that the

witness's testimony was false. (*See* Lodgment 21 at 16.)  Contradictory or inconsistent testimony by a witness does not constitute perjury. The jury heard conflicting versions of the incidents and as the superior court observed, it is for the jury to resolve the disputed testimony. *See United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002).

Accordingly, the state courts' rejection of Barno's claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.   Habeas relief is not warranted on this claim.

## **RECOMMENDATION**

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY ORDERED** no later than **July 20, 2012**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and served on all parties no later than **July 30, 2012.** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

DATED:  July 6, 2012

Hon. Bernard G. Skomal
U.S. Magistrate Judge
United States District Court

08cv2439-WQH